IN THE
UNITED STATES COURT OF APPEALS
FOR THE
ELEVENTH CIRCUIT
ATLANTA, GEORGIA

_____

APPEAL NO: 23-11033

_____

KENARD SINGH
Petitioner/Appellant

Versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
STATE OF FLORIDA
Respondent/Appellee

_____

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA
OCALA, FLORIDA

5:19-CV-00617-RBD-PRL

_____

INITIAL BRIEF

_____

RACHAEL E. REESE, ESQUIRE
Rachael Reese, P.A.
807 West Azeele Street
Tampa, Florida 33606
(813) 705-8239
Florida Bar No. 0111396
COUNSEL FOR APPELLANT

APPEAL NO: 23-11033

*Kenard Singh v. Secretary, Dept. of Corr., State of Florida*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26-1, I hereby certify that the persons listed below are interested in the outcome of this case:

1. Arnold, Robin, Assistant State Attorney,

2. Bachman, Shane, Trial Counsel,

3. Berger, Wendy W., United States District Judge,

4. Berndt, Amy, Assistant State Attorney,

5. Coffman, Paula C., Appellate Counsel,

6. Dalton, Roy B., Jr., Senior U.S. District Court Judge,

7. Edwards, James A., Judge, Fifth District Court of Appeal, Florida,

8. Eisnaugle, Eric J., Judge, Fifth District Court of Appeal, Florida,

9. Evander, Kerry I., Judge, Fifth District Court of Appeal, Florida,

10. Gladson, Bill, Elected State Attorney, Fifth Judicial Circuit, Florida,

11. Graves, Mike, Elected Public Defender, Fifth Judicial Circuit, Florida,

12. Hawthorne, Candance A., Trial Counsel,

13. Koller, Pamela J., Assistant Attorney General,

14. Lambert, Brian D., Chief Judge, Fifth District Court of Appeal, Florida,

15. Lammens, Philip R., U.S. Magistrate Judge,

16. Maro, Jack R., Trial Counsel,

17. Matthews, L. Charlene, former Assistant Attorney General,

18. Miller, William A., Assistant Public Defender,

19. Moody, Ashley Brooke, Elected Attorney General, Florida,

20. Ohlman, Jonathan D., Circuit Court Judge, Fifth Judicial Circuit, Florida,

21. Reese, Rachael E., Appellate Counsel,

22. Ross Tripp, Atom, Victim,

23. Sasso, Meredith L., Judge, Fifth District Court of Appeal, Florida,

24. Sawaya, Thomas D., Senior Judge, Fifth District Court of Appeal, Florida,

25. Smith, Brenda H., Trial Counsel,

26. Tripp, Thomas, Victim,

27. Wall, Rebecca Roark, former Assistant Attorney General,

28. Wallis, F. Rand, Judge, Fifth District Court of Appeal, Florida.

No publicly traded company or corporation has an interest in the outcome of this appeal.

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant, KENARD SINGH, does not request oral argument. It is respectfully submitted that argument is not required to assist this Court in resolving the instant action.

**CERTIFICATE OF STYLE AND FONT**

This brief is written in 14 point Times New Roman. To the best of Counsel's information and belief, it is 10 pitch.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... I

STATEMENT REGARDING ORAL ARGUMENT……………………………III

CERTIFICATE OF STYLE AND FONT……......…………….....….….....…....….......III

TABLE OF CONTENTS ..........................................................................................IV

TABLE OF AUTHORITIES ................................................................................VI

STATEMENT OF JURISDICTION……………………………………………1

STATEMENT OF THE ISSUES……………………………………………..1

STATEMENT OF THE CASE……………………………………….…1

    **(i)**    **Course of Proceedings and Disposition in the Court Below**…......1

    **(ii)**    **Statement of the Relevant Facts** ……………….………….....……6

    **(iii)**   **Standard of Review**……………………………………………22

SUMMARY OF THE ARGUMENT…………………………………………...24

ARGUMENT AND CITATIONS OF AUTHORITY……………………………25

   **I.**     **WHETHER THE DISTRICT COURT CORRECTLY DENIED APPELLANT'S CLAIM THAT HE WAS DENIED HIS SIXTH AMENDMENT RIGHT TO COUNSEL, IN VIOLATION OF <u>UNITED STATES V. CRONIC</u>, 466 U.S. 648 (1984), AT THE HEARING ON THE STATE'S MOTION TO VACATE THE GUILTY PLEA AND SENTENCE**……………………………………………..25

CONCLUSION ..........................................................................................35

CERTIFICATE OF COMPLIANCE ...............................................................36

CERTIFICATE OF SERVICE.................................................................................36

# TABLE OF AUTHORITIES

## Cases

Anders v. California, 386 U.S. 738 (1967)……………………………………..26

Butcher v. United States, 368 F.3d 1290 (11th Cir. 2004)……………..……..23, 24

Davis v. Alaska, 415 U.S. 308 (1974)…………………………………………….27

Melson v. Allen, 548 F.3d 993 (11th Cir. 2008)…………………………..……..23

Payne v. United States, 566 F.3d 1276 (11th Cir. 2009)……………...………..23

Pruitt v. Jones, 348 F.3d 1355 (11th Cir. 2003) …………………………….…..22

Strickland v. Washington, 466 U.S. 668 (1984)……………………..4, 5, 23, 24, 27

United States v. Cronic, 466 U.S. 648 (1984)……....…1, 4, 5, 24, 25, 26, 27, 33, 34

Ventura v. Att'y Gen., Fla., 419 F.3d 1269 (11th Cir. 2005)……………………..22

## Statutes

28 U.S.C. § 1291……………………………………………………………...1

28 U.S.C. § 1331……………………………………………………………...1

28 U.S.C. § 2254…………………………………………….……1, 4, 5, 22, 23, 25

## Rules

11th Cir. R. 26-1……………………………………………………………I

Federal Rule of Appellate Procedure 32…………………………………………..36

Florida Rule of Criminal Procedure 3.111……………….…………………….…..6

Florida Rule of Criminal Procedure 3.850……………….…………………….…..3

## STATEMENT OF JURISDICTION

Title 28 U.S.C. § 1291 provides that the court of appeals shall have jurisdiction of appeals from all final decisions of the district court of the United States except where a direct review may be had in the Supreme Court.

The United States District Court, Middle District of Florida, Ocala Division, had jurisdiction pursuant to Title 28 U.S.C. § 1331. This is an appeal from the Final Judgment entered by the District Court on February 28, 2023 (Doc. 16), after denying Appellant's Petition for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254. (Doc. 15). Appellant timely filed his Notice of Appeal on March 30, 2023. (Doc. 17).

## STATEMENT OF THE ISSUES

Whether the district court correctly denied Appellant's claim that he was denied his Sixth Amendment right to counsel, in violation of United States v. Cronic, 466 U.S. 648 (1984), at the hearing on the state's motion to vacate the guilty plea and sentence?

## STATEMENT OF THE CASE

### i.  Course of Proceedings and Disposition in the Court Below

The State Attorney's Office for the Fifth Judicial Circuit in and for Marion County, Florida charged Appellant, by indictment, with principal to murder in the first degree – felony murder. (Doc. 11-1 at 5). On October 22, 2012, Appellant gave

a sworn statement to the prosecutor detailing the events that occurred the day of the killing. (Doc. 11-1 at 7–72). On March 27, 2013, Appellant entered into a plea agreement with the State to a reduced charge of principal to second degree murder. (Doc. 11-1 at 74–76). In exchange for the reduced charge and a 21-year sentence, Appellant was required to testify at any proceeding against Brenton Crabtree "consistent with sworn proffered testimony given October 22, 2012." Id. at 74–75. The plea was accepted, and Appellant was sentenced to 21 years in prison. See Doc. 11-1 at 78–97, 99–107.

On May 8, 2013, Appellant testified at Brenton Crabtree's trial. (Doc. 11-1 at 138–201). As a result of his testimony, Crabtree was found guilty as charged. On May 13, 2013, Appellant's trial counsel, Jack Maro, filed a notice of non-representation. (Doc. 11-1 at 204–05). On May 17, 2013, the State moved to vacate Appellant's sentence or plea and sentence, alleging that Appellant failed to comply with the terms of the negotiated plea by providing testimony that was not consistent with the sworn proffer. (Doc. 11-1 at 207–97). The State served Mr. Maro with a copy of the motion to vacate. Id. at 209.

On May 21, 2013, the trial court held a hearing on the motion to vacate. (Doc. 11-1 at 299–333). On May 22, 2013, the trial court entered its written order granting the motion and vacated the judgment and sentence. (Doc. 11-1 at 335–38). The

order further granted Mr. Maro's motion to withdraw, appointed the Public Defender to represent Appellant, and set the case for trial. Id. at 337.

On November 25, 2013, Appellant moved for reconsideration of the order vacating his sentence and judgment. (Doc. 11-1 at 413–18). On November 27, 2013, the motion was denied. (Doc. 11-1 at 420).

On December 9-11, 2013, Appellant's trial on the charge of principal to first degree felony murder was held. See Doc. 11-1 at 422–794; Doc. 11-2 at 1–235. The jury found Appellant guilty as charged in the indictment. (Doc. 11-2 at 237). He was sentenced to life in prison. (Doc. 11-2 at 239-44). Appellant appealed. (Doc. 11- 2 at 246–83, 323–29). The Fifth DCA *per curiam* affirmed and issued mandate. (Doc. 11-2 at 331, 333).

Appellant moved for postconviction relief under Rule 3.850, Fla. R. Crim. P., raising three grounds of ineffective assistance of counsel. (Doc. 11-2 at 335–62). The successor judge, the Honorable Jonathan Ohlman, denied the motion after an evidentiary hearing. (Doc. 11-3 at 145-285). Appellant appealed. (Doc. 11-3 at 287). The Fifth DCA *per curiam* affirmed after oral arguments. (Doc. 11-3 at 375, 377). Appellant moved for rehearing, for rehearing *en banc*, and requested a written opinion. (Doc. 11-3 at 379–84). The motion was denied, and mandate issued on August 19, 2019. (Doc. 11-3 at 386, 388).

On December 4, 2019, Appellant timely filed a petition pursuant to 28 U.S.C. § 2254 with the district court. (Doc. 1). Of relevance to the instant brief, Appellant alleged that he received constitutionally deficient representation when counsel failed to adequately represent him at a critical motion hearing that resulted in the most damning prejudice possible. (Doc. 1, 2). Appellant argued that counsel's representation was so non-existent that this case fit within the rare exception of United States v. Cronic, 466 U.S. 648 (1984). The district court disagreed and found that Cronic was not appropriate. (Doc. 15 at 18). The district court denied Appellant's claim on the basis that there was no precise precedent that was instructive or gave a clear answer to the question raised by Appellant. (Doc. 15 at 23).

> Petitioner argues that his claim fits within the second exception identified in Cronic because his counsel "allowed the State to make a one-side argument, without any adversarial testing…" (Doc. 2 at 28). Petitioner claims that Mr. Maro was not prepared to represent him at the hearing and should have requested a continuance. Petitioner states that due to this lack of preparation, Mr. Maro put forth no arguments or evidence to support Petitioner's position and relied on the State's recollection of events. Id. at 27.
> No decision of the Supreme Court, however, squarely addresses the issue in this case or clearly establishes that Cronic should replace Strickland in this factual context. Nor does Petitioner identify such a case. Supreme Court precedents do not clearly hold that counsel's failure to present argument at a hearing on a motion to vacate plea but "made an effort to get him the best result I could," see Doc. 11-3 at 103, should entail the application of Cronic. In fact, the case cited by

Petitioner, <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), relied on <u>Strickland</u> to determine counsel's effectiveness.

Because Supreme Court precedent gives no clear answer to the question presented, let alone one in Petitioner's favor, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006) (quoting 28 U.S.C. § 2254(d)(1)). Further, the state court findings were reasonable, in accord with, and not contrary to, the principles of <u>Strickland</u>, which the state court cited as the controlling authority on ineffective assistance of counsel claims. Finally, the state court's findings were not unreasonable, given the evidence in the state court proceedings. 28 U.S.C. § 2254(d)(2). Under the explicit terms of § 2254(d)(1)-(2), therefore, relief is unauthorized.

(Doc. 15 at 22-23). Following the issuance of the order, Appellant appealed and filed an Application for a Certificate of Appealability. On January 10, 2024, the Honorable Court granted Appellant's application as it relates to the singular issue of:

Whether the district court correctly denied Singh's claim that he was denied his Sixth Amendment right to counsel, in violation of <u>United States v. Cronic</u>, 466 U.S. 648 (1984), at the hearing on the state's motion to vacate the guilty plea and sentence?

Appellant respectfully submits that the answer to that question, which will be further addressed below, is no.

### ii.  Statement of the Relevant Facts

Appellant entered into a plea agreement with the State of Florida that agreed to allow Appellant to enter a plea to a reduced charge of principal to second degree murder with a sentence of 21 years in the Florida Department of Corrections, so long as he were to testify against his co-defendant Brenton Crabtree "consistent with sworn proffered testimony given October 22, 2012." During the plea colloquy, where he agreed to these terms, the prosecutor asked Appellant the following questions under oath:

> PROSECUTOR: Your Honor, if I, if I could, to just make sure the record is clear, if I may inquire of Mr. Singh. Mr. Singh, by entering this plea, you're swearing under oath - the judge put you under oath - that the proffered testimony that you gave back in October is, in fact, the truth about what happened?
> APPELLANT: Yes, sir - yes, ma'am.
> PROSECUTOR: And you understand that, if you do not fulfill the - our requirements of this plea, the judge could sentence you up to life in prison?
> APPELLANT: Yes, ma'am.

(Doc. 11-1 at 92). On May 8, 2013, Appellant testified at the trial of Brenton Crabtree – who was ultimately found guilty as charged, as a result. Less than a week later, Mr. Maro filed a "Notice of Non-Representation" with the state court, wherein he alleged that "undersigned counsel's responsibility to the Defendant terminated, pursuant to Rule 3.111 and within the terms and conditions of his employment contract with the Defendant." (Doc. 11-1 at 204). Soon thereafter, on May 17, 2013, the State filed a motion to vacate Appellant's sentence and/or his

6

plea, based on his alleged failure to comply with the terms. The State served Mr.

Maro with the notice of hearing on the motion to vacate. (Doc. 11-1 at 209).

On May 21, 2013, a hearing was conducted on the State's motion to vacate.

At the beginning of the hearing, the question of who was representing Appellant

was raised.

> TRIAL COURT: […] Mr. Maro's in the audience. Are you not his counsel?
>
> MR. MARO: No, sir. Judge, I filed a notice with the Court. We had entered a plea. You had accepted the plea. You sentenced him. No appeal was taken in accordance with the rule within the 30 days. Mr. Singh is no longer my responsibility.
>
> TRIAL COURT: Is that accurate?
>
> MS. ARNOLD: Your Honor, quite frankly, I do not know the answer to that. I noticed Mr. Maro because the plea was conditioned on Mr. Singh's testifying truthfully which the State filed the motion because it's the State's belief that he substantially was non-compliant with his portion of the plea agreement so that's why I noticed Mr. Maro.
>
> TRIAL COURT: Uh-huh.
>
> MS. ARNOLD: But as far as the state of the law when his responsibility toward Mr. Singh ends, I do not know the answer to that.

(Doc. 11-1 at 301). Mr. Maro also emphasized the fact that he would not represent

Appellant because he had not been paid. The discussion of when representation

should end pursuant to the rules continued, and ultimately Mr. Maro stated the

following:

MR. MARO: I'm not representing him at the hearing today. That's the whole misunderstanding behind –

TRIAL COURT: Well, I know. That's insignificant to me.

MR. MARO: Because I don't think it's appropriate for me to represent him here today.

TRIAL COURT: Well, that's your argument and I may differ with that.

MR. MARO: Okay.

TRIAL COURT: So that's why we're having our discussion.

MR. MARO: Yes, sir.

TRIAL COURT: I understand that you – that after today, if for some reason I believe your notice of non-representation hasn't accomplished what you want it to accomplish, but after today, if he loses the motion today, if the State wins on its motion, then you may say, look, Lambert made me stay here today, but now I am getting out because you've already not paid me. You need to go find another lawyer. Take the P.D. - I understand all that.

MR. MARO: Okay.

TRIAL COURT: That I wouldn't - I'm not gonna put Jack Maro to say you've got to try a free case. I understand all that … But I mean, the factual context of this today is he plead with the understanding he needed to do that. Now it's gonna be undone. It seems like he needs to have somebody here on his behalf. Why wouldn't you be the logical person to be here on his behalf? You don't have a conflict as to what caused him to be in the position today. It's frankly his own - just so you appreciate, I was clear - I had a visceral reaction to it as I listened to him testify, thinking what did the State make a deal with this guy about to testify about anything. He's testifying to nothing. In fact, he's testifying not helpfully. I mean, it was fundamentally apparent that he was doing that. I mean, and I read the proffer. You were present at the proffer where he said, I saw the guy had the gun, I saw the guy load the gun, and then when he was at the trial, "what gun?", "what gun?", you know. Stunningly, I mean, I don't know why you make deals with anybody, frankly. If that's the analysis - if that's the benefit you get from the plea deals, you're better off just rolling the dice and having this guy go to prison for life if he gets convicted too.

MR. MARO: Well, Judge, if you believe that counsel is in a position to sit at a table with Mr. Singh and after Mr. Singh has heard the colloquy back and forth, if he's comfortable with me sitting here, obviously, you know, I will acquiesce to the court.

(Doc. 11-1 at 306-308). The court again stated that it wanted to resolve the motion that day, and stated, "Well, I think you should stay for today, and if you want to withdraw then, I'll enter an order allowing you to withdraw after the fact." (Doc. 11-1 at 309). Appellant was never asked if he wanted Mr. Maro to represent him at the hearing.

The State argued that Appellant's testimony at Brenton Crabtree's trial was not consistent with his sworn proffer, and pointed to numerous differences between the proffer and the trial testimony. The State also placed into evidence a recording of Appellant during a phone call at the jail. In that phone call, Appellant admitted that during Brenton Crabtree's trial he "tried to help him" by testifying he "didn't see no gun" and "never seen him load up no bullets, none of that shit". (Doc. 11-1 at 313). Appellant also said that if Brenton Crabtree got a new trial, Appellant would not testify again and would "say I don't remember nothing." (Doc. 11-1 at 314). Mr. Maro did not present any evidence or argument against the State's motion. Instead, Mr. Maro threw Appellant under the bus.

Well, Judge, you know, I think it would be – I mean, I'm already here in the midst of this thing and I agree with you, I don't think – you know, he's 20 years old, first of all. Youthful offender doesn't apply because of the nature of the crime so that's out of the box as far as potential mitigation and we've discussed this.

The other factor is when I got involved in this case, we diligently pursued efforts, and Mr. Singh knows this, we've met numerous, numerous times to implore the State to do something for him. When you look at the overall factual scenario of really the stupidity of the whole thing. And Ms. Arnold did, in fact, come down to 25 years and she stuck to her guns and actually came down to 21 years the day that we were going to enter a plea in this case, to accommodate – take into consideration the youth and other things. So she did everything she could.

Apparently, my counseling isn't worth anything. I mean, candidly with the court, you know, he hasn't taken any of the advice that I've given to him all along. Maybe he best be served with a new set of eyes on this. Maybe somebody else can explain to him – I mean, this is his life that's involved here so I think it would appropriate maybe to appoint the public defender. At least have somebody who's been around the block long enough and certainly I have been doing this for 39 years and handled enough murder cases and been successful on an awful lot of them. But somebody maybe needs to talk to him with a different accent to make him understand when he makes this choice, the severity of it either way.

(Doc. 11-1 at 326-27). During the remainder of the hearing, the parties discussed whether the court could leave the plea intact and only vacate the sentence, or whether the court had to vacate both the plea and the sentence. (Doc. 11-1 at 315-323).

The court then went into its decision. The court characterized the situation as Appellant having decided that it was better to help Crabtree than to proceed with the agreement. After commenting on his recollection of Appellant's testimony during the Crabtree trial, the court stated that, if Appellant wanted "to be stupid and make those calls, I'll help him be stupid," indicating that Appellant would never again be

sentenced to twenty-one years. The court then granted the State's motion, vacating the plea and sentence. The court also appointed the Office of the Public Defender.

On November 26, 2013, Appellant filed a "Motion to Reconsider Vacation of Defendant's Sentence" through his new counsel, Mr. Graves. As grounds for reconsideration, the motion initially pointed out that Appellant was forced to proceed with the hearing on the State's motion to withdraw plea with counsel that objected to further legal representation of Appellant based upon an asserted conflict of interest and that counsel, who was not present during the Crabtree trial, was unprepared to competently represent Appellant at the hearing. The motion further outlined substantial evidence and arguments left unpresented at the hearing on the State's motion, asserting that Appellant's testimony in the Crabtree prosecution had been instrumental in securing a conviction as charged, which had resulted in the imposition of a life sentence in that case. The motion specifically pointed out that Appellant had identified Crabtree in Crabtree's trial, that Crabtree had asked him to assist in obtaining a gun so that he could rob somebody; that he, Timothy Nixon, Crabtree and Crabtree's brother Keith, rode together in a black Altima driven by Nixon to try to secure a weapon; that Crabtree used Appellant's cell phone to make a call to obtain ammunition; that Appellant provided $20.00 to Crabtree to purchase ammunition; that Crabtree took the money and then left with his brother, returning a short time later with a bag they put in the trunk; that Crabtree put on a spiderman

ski mask and gloves prior to the shooting; that Crabtree's brother and Nixon went to a nearby McDonalds while he and Crabtree approached the victim's house (which he identified at trial); that Crabtree directed him to try to open the back door of the residence; that he witnessed Crabtree throw a pail at the front door of the residence; that while at the back door with Crabtree, he heard several shots coming from Crabtree's location behind him; that he and Crabtree ran from the residence after the shots were fired; that he could have seen Crabtree with a gun as he and Crabtree were running from the victim's house; that he call Nixon to pick them up; that when they got to the car Crabtree told his brother that he (Crabtree) had shot the gun; that Crabtree was the only other person present when shots were fired; and that he had picked Crabtree out of a photo lineup. (Doc. 11-1 at 413-418).

The motion further pointed out that both sides in the Crabtree trial had argued that Crabtree's guilt hinged on the credibility of Appellant's testimony. The prosecutor had argued in closing that Appellant's testimony "fills in the gaps" for their case against Crabtree. In addition, the prosecutor vouched for the credibility of its witness in its final closing, reciting a list of circumstances that "point to the truth of Kenard Singh's testimony."

For the first time in any proceeding, the motion pointed out that Appellant suffered from a learning disability indicating that he functioned in the mentally retarded range with a 5th grade reading level and that he was taking a prescribed

antipsychotic at the jail for Bipolar Personality Disorder. Finally, the motion asserted that Appellant feared for his life due to his cooperation with the State, and with good reason. Upon making contact with Appellant during their investigation of the case on March 14, 2012, two detectives told Appellant that he had better be worried about the Crabtree brothers because the word on the street was that they wanted to harm him. The brothers were members of the "Bloods" street gang. On May 7, 2012, Crabtree attempted to extort food from another inmate at the Marion County Jail as part of "new Blood law". When the inmate refused, he was severely beaten by Crabtree and his cohorts. According to the motion, Crabtree was subsequently sentenced to prison for the offense. The motion also alleged that, at various times during Appellant's incarceration in Marion County Jail awaiting trial in this Crabtree and his brother were also incarcerated there. (Doc. 11-1 at 413-418).

Regardless of the new information and arguments presented in the motion, the trial court denied the motion and set Appellant's case for trial – where he was ultimately found guilty and sentenced to life imprisonment. Following the completion of Appellant's direct appeal, he filed a motion for postconviction relief with the state court and amongst other claims, argued that trial counsel (Mr. Maro) was deficient in his representation of him at the motion hearing. An evidentiary hearing on his motion for postconviction relief was ultimately held in March of 2018. Appellant testified that because of his incriminating statement he made to law

enforcement early on, his intentions were always to enter a plea and never to go to trial – all of which was discussed with Mr. Maro. (Doc. 11-3 at 18-19). As a result, when the State offered him the plea agreement, he happily accepted. Id.

Prior to the entry of the plea, Appellant testified that he and his family had good communication with Mr. Maro. Mr. Maro would visit him at the county jail, write him letters, and communicate with his family about what was going on. (Doc. 11-3 at 19). However, after he accepted the plea and was sentenced, but before he ever testified in Mr. Crabtree's trial, Mr. Maro stopped communicating with him. Appellant was not visited at the county jail, written any letters, or communicated with via his family by Mr. Maro. (Doc. 11-3 at 20). The only form of any communication was when Appellant's deposition was taken immediately before Mr. Crabtree's trial. However, during that deposition, Mr. Maro did not even show up and instead, sent an associate named Shane Bachman in his place. Id.

Prior to Mr. Crabtree's trial, Appellant testified about receiving several threats about being a witness in Mr. Crabtree's case. During Mr. Crabtree's actual trial, Appellant saw him through a set of doors and Mr. Crabtree physically "blew a kiss" towards him. (Doc. 11-3 at 21). Appellant's cooperation was well-known throughout the jail and with the general public because it was in the newspaper. Some of the other inmates advised him that they would not do it if they were him because of the types of things that happen to people who "tell[] on a codefendant or on – tell on

cases." (Doc. 11-3 at 23). Mr. Crabtree was well-known throughout the jail and was affiliated with members of a gang. As a result, Appellant believed that Mr. Crabtree was capable of doing the dangerous things he had heard about. Mr. Crabtree was very dangerous.

Before his deposition, Appellant advised Mr. Bachman and Assistant State Attorney Robin Arnold that he was scared. In response, they advised him that the Crabtree's would not have any contact with him.

Several weeks later, he testified in Mr. Crabtree's trial. However, Mr. Maro never came to see him or help prepare him for that testimony. (Doc. 11-3 at 28). Mr. Maro did not go over his proffer with him and he did not show up at Mr. Crabtree's trial while he testified. (Doc. 11-3 at 29).

After Appellant testified, he received a notice that the State was seeking to have his plea withdrawn because he had not successfully fulfilled the terms of his plea agreement. At the hearing where the State's motion was heard, Mr. Maro represented Appellant. However, Mr. Maro never attempted to talk to Appellant about why he had testified in the manner he did at the Crabtree trial.

> I didn't get a chance to even speak to him. When I walked into the courtroom, he was in the stands and I just sat down at the defense table and when we rised [sic] and the judge asked – asked who was representing me, he was in the stands, talking from the stands, until he walked up. And then when he walked up to the defense table, we didn't talk about nothing. He just listening to what the judge had to say and he went on from there, on to the hearing.

(Doc. 11-3 at 30-31). Appellant did not have a chance to talk to Mr. Maro about what his options were at that point in time, nor did he speak to him about the threats he had been exposed to or the feelings he'd been having about testifying. Appellant did not have a single moment of contact with Mr. Maro before the evidentiary hearing or during the hearing. As a result of the State's motion, and Mr. Maro's representation, his plea and sentence were withdrawn and he was forced to go to trial.

Elected Public Defender for the Fifth Judicial Circuit Michael Allan Graves was the next witness called to testify during the hearing. (Doc. 11-3 at 55). Mr. Graves testified that one of the reasons for filing the Motion to Reconsider, after the State's motion had been granted, was because of the lack of evidence or argument presented on behalf of Appellant. (Doc. 11-3 at 60-61).

> We felt so, in part, by the judge requiring Mr. Maro to go forward at that point when expressly he had indicated he didn't want to represent him or couldn't represent him. Mr. Singh didn't want him to represent him. So, yes, that's, I think, one of the reasons … there was a record of what we had felt the reasons that Mr. Singh's motion – or the Motion to Set Aside was wrongfully granted, because there really wasn't any evidentiary proceeding that we saw in this, as well as certain factors that we had found from Mr. Singh, that you've discussed today, with regard of his fear of the Crabtrees.

(Doc. 11-3 at 71-72). Mr. Graves testified about what his office would have done in a similar situation.

> Q: Had your office been appointed at that point in time, would a continuance have been – that would have been something that would

have been helpful towards an attorney that had no knowledge of the facts of that hearing; correct?

…

A: We certainly would have requested a continuance in that matter, to become familiar with the case because we had no knowledge of the plea agreement at that time, no knowledge of what Mr. Singh had testified to. frankly, had – we had no notice on the motion to prepare ourselves for argument.

(Doc. 11-3 at 74).

Attorney Jack Maro was the last witness called to testify at the hearing. Mr. Maro agreed that from the beginning of his representation, he would characterize the representation as trying to resolve the case with something less than life in prison, rather than go to trial and face life. Mr. Maro testified that he was never advised that Appellant was in fear or had concerns about being threatened by Mr. Crabtree. Mr. Maro did testify that he found it weird that Appellant was sentenced at the time of his plea and his sentence was not deferred. (Doc. 11-3 at 85).

Yeah. Normally – we all know, it's normally – it's kind of a condition precedent, not a condition subsequent. It's you agree to a plea. The State makes a representation that this is its recommendation, and then it's deferred sentencing to make sure that the recipient honors the terms of the plea.

When the judge actually accepted the plea, we jumped on the 21 years. I was happy to get it done and sentenced, because now we had it. it was a lock on it. it's not a matter of you coming back later on, saying, 'Well, maybe he didn't do exactly what I thought,' or et cetera.

So that, to me, finished the case for him. All he had to do was just step up and say what he said in the proffer.

(Doc. 11-3 at 86).

Mr. Maro was informed about the State's motion to vacate the plea through a phone call. Mr. Maro then appeared in court, but his understanding of his appearance was solely to bear witness to the plea, the proffer and the sentencing that had already taken place. Mr. Maro was not aware that he would be representing Appellant at that hearing. (Doc. 11-3 at 86-87). Mr. Maro testified about his understanding about his role.

> I felt I was not his attorney of record any longer procedurally since I had filed everything. Judge Lambert took a different posture to this. And I tried to explain to Judge – is that, you know, basically, look, I'm in a bad situation here. I didn't sit through trial.
>
> In fact, you know, financially I wanted not to be involved in this, flat out, that there was a large sum of money was owed to our firm, and they may wind up becoming defendants in a lawsuit. That creates an automatic conflict.
>
> So that's where we were, but all that aside, it was very clear to me that Judge Lambert was going forward and basically said, "You are representing Mr. Singh." And, I think, if you'll look in the transcript, I even said, "Well, after Mr. Singh has heard all of this, I don't know if he wants me to sit over here." Of course, there was no response, but he didn't say no.

(Doc. 11-3 at 87-88).

On cross-examination, Mr. Maro admitted that in order to receive the 21-year sentence, Appellant had to testify truthfully as a condition, regardless of whether he was sentenced before or after Mr. Crabtree's trial. However, Mr. Maro did not believe that his services were necessary as Appellant's counsel while he testified in Mr. Crabtree's trial. Ironically, Mr. Maro did believe that if Appellant had not been

sentenced at the same time his plea was entered, he would have been present in the back of the courtroom, while Appellant testified against Mr. Crabtree, because he still would have been his counsel. (Doc. 11-3 at 96). Thereafter, the following dialogue took place:

Q: Now, after Judge Lambert and you had the – essentially, when he made you stay on the case and act as Mr. Singh's lawyer, knowing those things, not being prepared, not have gone to the trial, having no idea about what these allegations are, wouldn't you agree that asking for a continuance to familiarize yourself with that, would have be – would have been beneficial to both yourself and Mr. Singh?

A: Well, now, you're assuming I'm his lawyer.

Q: I guess a better question is –

A: I didn't accept – I didn't accept the judge's position in this case. I sat –

Q: So your testimony is that you did not (indiscernible)?

A: He didn't accept it either. Mr. Singh did not accept. He never acquiesced to me being his attorney after the judge told me to sit down at that chair.

Q: So it's your testimony that you were not acting as Mr. Singh's lawyer that day and making arguments on his behalf?

A: I made arguments on his behalf, but I want you to understand that I was told to do this and to deal with this problem, all right? And my concern with the problem is I did not have the information to deal with the problem.

Q: I understand.

…

Q: My question is: were you acting as his lawyer on that day at that hearing?

A: I guess I was, yes ma'am.

(Doc. 11-3 at 102-03). Mr. Maro also agreed that the best option for Appellant would have been to try and beat the State's motion and secure the 21-year sentence and plea agreement. Id. However, Mr. Maro did not know if that was a viable option at the time because he had no idea what had gone on during Mr. Crabtree's trial. (Doc. 11-3 at 106-07). Mr. Maro admitted that the only reason he had the same position as the State was based on the State's arguments. Id. He further admitted that if he had known more information, such as what happened at trial and what happened before trial to Mr. Singh, he may have had a different opinion. (Doc. 11-3 at 108). Lastly, Mr. Maro testified about sending his associate, Shane Bachman, over to handle things *after* the plea was entered.

Q: Mr. Maro, in light of the information with that, would you have sent Mr. Bachman as a representative from your office if your office was not still representing Mr. Singh?

A: That's an interesting question, counselor, because like I said, we're very client orientated. So I would assume, yes ma'am, I would have done it, but in this case he probably went over as an officer, from working for me.

(Doc. 11-3 at 110).

The state court ultimately denied Appellant's motion for postconviction relief and as it relates to this claim, found as follows:

The transcript from the motion hearing indicates counsel did make preparations in anticipation of the hearing. Counsel read the motion and transcript prior to the hearing. Counsel conducted research and reviewed case law prior to the hearing. Counsel provided the court with a more recent case than the case law the State relied on. Counsel explained to the court counsel no longer represented the defendant; counsel was not at the codefendant's trial, counsel had a conflict due to unpaid fees, and there would be post-hearing complications if the court refused to recognize counsel no longer represented the Defendant. Counsel requested the court delay the proceeding and appoint the Office of the Public Defender to represent the Defendant. Clearly, Judge Lambert was not inclined to grant the Defendant a continuance. Over counsel's objection, the court pressed forward with the State's motion and pressed counsel to "acquiesce" into "sitting at the table" with the Defendant. Counsel agreed to do so if the Defendant was comfortable with counsel representing him. Defendant was present for all of this exchange, but did not object.

…

At the postconviction evidentiary hearing, counsel explained his thought processes and his strategy while representing the Defendant at the hearing on the State's motion to vacate. Counsel testified that given the court's temperament and findings that the Defendant materially breached the plea agreement, counsel believed it would be harmful to the Defendant to maintain the guilty plea and simply agree to resentencing when the Defendant would be exposed to a life sentence. Counsel believed it would be better to place the Defendant back in the same position the Defendant was in prior to the Defendant's plea so the public defender could attempt to renegotiate a plea with the prosecutor. Counsel had already successfully negotiated the Defendant's sentencing exposure down from a life sentence, to 25 years, and then to 21 years. Counsel stated that he knew from past experiences that the prosecutor was a reasonable person. Counsel was correct. The State of Florida did ultimately soften and agree to a plea offer less than the minimum mandatory life term.

Under the circumstances, counsel's performance was not outside the broad range of reasonably competent performance. Nor has the Defendant demonstrated prejudice or that there is a reasonable

probability the result of the proceedings would have been different. Defendant was subsequently represented by the Office of the Public Defender. The assistant public defender raised the very issues the Defendant now raises when the public defender filed the November 25, 2013 Motion to Reconsider Vacation of Defendant's Sentence. Judge Lambert considered the motion on the merits and denied it. Defendant cannot demonstrate prejudice where the issues counsel failed to raise were ultimately raised by a second attorney and rejected by the trial court and the appellate court. The Defendant's first ground for relief should be denied.

(Doc. 11-3 at 144-154).

### iii. Standard of Review

This circuit reviews the district court's denial of habeas corpus relief de novo, and its finding of fact for clear error. <u>Pruitt v. Jones</u>, 348 F.3d 1355, 1356 (11th Cir. 2003). Under 28 U.S.C. § 2254(d), a federal court may not grant habeas relief on claims that were previously adjudicated in state court, unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law … or resulted in a decision based on an unreasonable determination of facts in light of the evidence presented in the state court proceeding." <u>Id</u>. A state court's decision is contrary to clearly established Federal law if the state court: (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. <u>Ventura v. Att'y Gen., Fla.</u>, 419 F.3d 1269, 1280-81 (11th Cir. 2005). Additionally, the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, (also

known as AEDPA) provides: "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Federal habeas relief is available to correct only those injuries resulting from violations of the Constitution or laws or treaties of the United States. 28 U.S.C.A. § 2254(a). See also, Melson v. Allen, 548 F.3d 993, 996 (11th Cir. 2008).

This Court reviews an ineffective assistance of counsel claim, a mixed question of law and fact, de novo. Payne v. United States, 566 F.3d 1276, 1277 (11th Cir. 2009).Claims of ineffective assistance of counsel require the petitioner to show both that his attorneys' performance was deficient and that their deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). In evaluating performance, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690, 104 S.Ct. at 2066. It is petitioner's burden to "establish that counsel preformed outside the wide range of reasonable professional assistance" by making "errors so serious that [counsel] failed to function as the kind of counsel guaranteed by the Sixth Amendment." Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir.2004) (citing Strickland, 466 U.S. at 687–89, 104 S.Ct. at 2064–65). Showing prejudice

requires petitioner to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. at 2068. "The prejudice prong requires a petitioner to demonstrate that seriously deficient performance of his attorney prejudiced the defense." <u>Butcher</u>, 368 F.3d at 1293 (citing <u>Strickland</u>, 466 U.S. at 687, 104 S.Ct. at 2064).

## SUMMARY OF ARGUMENT

The district court erred in denying Appellant's claim that he was denied his Sixth Amendment right to counsel, in violation of <u>United States v. Cronic,</u> 466 U.S. 648 (1984), at the hearing on the state's motion to vacate the guilty plea and sentence. Although not the norm, Appellant's case falls within the rare exception where counsel completely fails to perform any task on their clients behalf. After showing up to the most critical hearing in Appellant's case – where the State was trying to renege on the plea agreement and force him to an unwinnable trial – counsel did not even want to represent Appellant and but for him being forced to do so, he would have sat there silently. Unfortunately, even after being forced to represent Appellant, counsel's actions were not much greater than sitting silent. Counsel allowed the State to make arguments about why the plea agreement was violated, and counsel failed to rebut or argue against those arguments. Counsel had multiple good faith arguments that could have been made as to why Appellant was not in

violation of his plea agreement, but he failed to do so. Counsel simply stood by and allowed the state court to find there was a breach of the agreement and then counsel offered his two cents about what type of relief the court should order. By the time that counsel vocalized any argument whatsoever, the harm had already been done.

Counsel completely failed to subject the State's case to any adversarial testing and as a result, the proceedings were completely unreliable. The district court erred in denying Appellant relief, and a review of the record will lead this Court to the only acceptable result – to vacate that order and find that Appellant is one of the unique defendants identified in <u>Cronic</u>. Upon making that finding, this Court will find that Appellant is entitled to have his judgment and sentence vacated, and his case remanded to the state courts to remedy the situation.

## ARGUMENT AND CITATION OF AUTHORITY

**I. WHETHER THE DISTRICT COURT CORRECTLY DENIED APPELLANT'S CLAIM THAT HE WAS DENIED HIS SIXTH AMENDMENT RIGHT TO COUNSEL, IN VIOLATION OF <u>UNITED STATES V. CRONIC</u>, 466 U.S. 648 (1984), AT THE HEARING ON THE STATE'S MOTION TO VACATE THE GUILTY PLEA AND SENTENCE?**

The district court erred in denying Appellant's motion filed pursuant to Title 28, United States Code, Section 2254, because Appellant established that trial counsel completely failed to subject the prosecution's case to meaningful adversarial testing during the most critical proceeding in Appellant's case. Counsel conceded to his lack of preparation at the time of the hearing, and again during the evidentiary

hearing on the ineffective counsel motion filed by Appellant. Appellant would have likely been better off if he was representing himself because counsel failed to make any arguments in support of his client, and allowed the State to take away the negotiated plea and sentence that Appellant deserved. The district court's failure to recognize such a unique and complete lack of constitutionally effective representation is erroneous.

In <u>United States v. Cronic</u>, 466 U.S. 648 (1984), the United States Supreme Court entertained an appeal by the government, made after the appellate court found counsel was ineffective. The Court ultimately reversed and remanded the opinion, finding that the facts did not rise to the level of any actual ineffectiveness. However, the analysis used to get to their ultimate holding is crucial to Appellant's current scenario.

> [T]he adversarial process protected by the Sixth Amendment requires that the accused have "counsel acting in the role of an advocate." <u>Anders v. California</u>, 386 U.S. 738, 743, 87 S.Ct. 1396, 1399, 18 L.Ed.2d 493 (1967). The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. …
>
> *       *       *
>
> In our evaluation of that conclusion, we begin by recognizing that the right to the effective assistance of counsel is recognized not for its own

sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. ... There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.

Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in <u>Davis v. Alaska</u>, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), because the petitioner had been "denied the right of effective cross-examination" which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' " <u>Id</u>., at 318…

<u>Cronic</u>, 466 U.S. at 657-59. (Internal citations omitted).

Just as <u>Strickland</u> identifies a rule of law that is applied to different factual situations where defendants feel they have received deficient counsel, <u>Cronic</u> does the same thing for a small and rare set of cases – the instant case being one of them. The reason that Appellant's case falls within the rare exception recognized in <u>Cronic</u> is because counsel's lack of representation was so egregious and unreasonable that the State was able to do whatever it wanted in Appellant's case – Appellant might as well have been representing himself.

The most critical stage of Appellant's case was when the State moved to have Appellant's sentence and conviction withdrawn after the alleged violation of his plea

agreement. This was so critical because if the motion was granted and his plea was withdrawn (as it was), Appellant was literally forced to go to trial where he was facing a mandatory life sentence. Making this more critical, and further highlighting the egregious actions of counsel, Appellant was **going to be found guilty** at trial because he had confessed to **everything** to law enforcement. Appellant's confession was one of the reasons that trial counsel sought after a cooperating plea in the first place. Meaning, at the time that the plea was in jeopardy of being revoked, the Appellant needed the constitutionally guaranteed representation of effective counsel.

The record reveals that from the very beginning, trial counsel failed to recognize his duties as counsel under the Sixth Amendment. Trial counsel appeared at the evidentiary hearing on the State's motion to vacate Appellant's sentence and proposed that he was not counsel anymore. Trial counsel and the state court went back and forth about why counsel was still representing Appellant. This was important because (1) if trial counsel was not representing Appellant, then who was; and (2) if trial counsel had not thought he was still representing Appellant, how could he have been prepared? The answer is that counsel was not prepared. The state trial court correctly found that trial counsel was still Appellant's counsel at the time of the state's motion and thus, still owed Appellant the same effective assistance of counsel as he did prior to Appellant's plea agreement. But, because counsel had not

believed he was counsel before the hearing and as a result, had not prepared for the hearing, counsel should have requested a continuance.

Counsel's failure to request a continuance in order to prepare, and his decision to continue forward with the hearing as planned, resulted in his inability to represent Appellant under any reasonable standard of professional norm. First, counsel was not even up to speed on the status of Appellant's case, as he had abandoned Appellant after he entered his plea. Trial counsel never visited or spoke with Appellant again, even before he was to testify in Crabtree's trial. Trial counsel ignored Appellant's valid fears of retribution for turning on a co-defendant. Moreover, trial counsel did not even show up to Crabtree's trial to make sure his client upheld the conditions of his plea agreement. At the evidentiary hearing on Appellant's postconviction motion, trial counsel admitted that he had no idea what was going on when he arrived at the State's motion hearing. Trial counsel described it as a "bad situation" and specifically identified that he did not know what to do because he had failed to appear for Mr. Crabtree's trial. Therefore, by his own admission trial counsel was in no shape to represent Appellant, having had zero preparation, and should have made that clear when the state trial court made its finding that counsel would be forced to represent Appellant.

Counsel's representation of Appellant thereafter hardly even qualifies as representation under the Sixth Amendment, because he entirely failed to subject the

State's case to adversarial testing and ultimately, because of his lack of any preparation, piggy-backed onto the State's position instead of creating independent arguments based on the facts. After the state court forced counsel into representing Appellant, his representation became more of a technicality rather than a constitutional right. In order for counsel's representation to have satisfied what is required under the Sixth Amendment – as well as the recognized decisions expounding upon that right – counsel would have argued against the State's position that Appellant violated his plea agreement because (1) any violation was de minimis and (2) Appellant did not do anything knowingly or voluntarily because of his fear of retaliation from his co-defendants.

First, trial counsel should have argued that Appellant was not in violation of the plea agreement because any violation was de minimis and did not rise to the level of substantial noncompliance. Even a ten-minute conversation with Appellant would have revealed the issues discussed at the evidentiary hearing and disclosed in the motion ultimately filed afterwards by the Office of the Public Defender (in an attempt to rehabilitate trial counsel's lack of representation). Furthermore, even looking at the factual noncompliance issues with Appellant's testimony revealed a legitimate and legal argument as to a de minimis violation. The State only presented evidence of two factual noncompliance issues: (1) Appellant had previously testified in a proffer that he saw the gun in the car after they got the bullets and saw Crabtree

lading the gun at this time; and (2) Appellant saw Crabtree throw a rock that smashed the driver's side window of the vehicle in front of the victim's house. The State argued that in trial, Appellant denied those two factual points. However, had trial counsel prepared himself and fought against the State's position, he would have been able to articulate that those two points were minimal in comparison to the remainder of Appellant's testimony, which was identical to his previous proffer, and ultimately led to Mr. Crabtree's conviction. The State focused their entire closing argument in Mr. Crabtree's trial on Appellant's testimony and therefore, established on its own that his testimony was clearly not in violation of the agreement because it was the basis for the conviction.

Not only did counsel fail to argue that Appellant was not in violation of the agreement because any issues or discrepancies were de minimis, but counsel also failed to argue that any violation was not done knowingly and voluntarily, as would be required, due to the fear and pressure that Appellant felt from testifying. This would be the perfect representation of duress, which would have served to corroborate the argument that any violation was de minimis and not substantial enough to rise to a violation. Yet, no argument similar to this ever left counsel's mouth during the hearing at issue. Respectfully, no argument in support of Appellant's position, or any defense position, was ever made.

The first portion of the hearing, as laid out above, concerned the state court and counsel disputing over whether counsel was still representing Appellant at the hearing. The next portion of the hearing involved the State rearguing the points that were raised in the written motion. (Doc. 11-1 at 310-14). Counsel made no response to those points at that phase of the hearing. The court then inquired about what options were available, if the plea was vacated (after a finding that a violation had occurred). (Doc. 11-1 at 314-15). The first time that counsel even made any substantive comment or otherwise was two-thirds of the way through the hearing when the trial court asked whether he wanted to respond to the State's allegations. (Doc. 11-1 at 323).

> COUNSEL: Well, Judge, counsel s concern -- obviously, I didn't sit through the trial, The Court sat through the trial. The court heard the nature of the, I guess the efforts to rehabilitate Mr. Singh during the course of the trial with the impeachment and then his responses thereto.

> COURT: Yeah, it was pretty surprising.

> COUNSEL: The two specific allegations here today. I mean, it's more of a factual determination, you know, you're going to have to make. Are they of such a nature, with an argument of such a nature that it undermined the intent of the plea agreement and basically to torpedo the State1s case in chief substantially and if you believe that it did, and obviously, you've just ruled accordingly. I mean, there's not much else I can say to you, as far as that's concerned. As far as the representations from the State to the jail call, I mean, it is what it is. I'm not going to take issue either way with that. I mean, if, you know, they represent to you it's Mr. Singh, unless he can specifically tell counsel that it's not him, I have no basis to, you know, interject on this, so –

(Doc. 11-1 at 324-26). Counsel then asked Appellant on the record, before the trial court, about whether he wanted to deny being the person on the jail call – without having had any time to speak with him off the record or during a privileged conversation. Counsel continued to throw Appellant under the bus, and then simply shifted all discussions to the remedy that the court would be requesting – either to vacate just the sentence, or to vacate the plea and sentence. Meaning, counsel literally gave up and conceded that the error was enough to vacate either – which it was not. Throughout the thirty-four (34) pages of transcripts from the hearing, counsel never made a single argument in support of Appellant being found not in violation of the agreement– the epitome of failing to subject the State's case to adversarial testing.

The state court, in denying Appellant relief on this issue, found that counsel acted strategically in his representation – and the district court adopted that reasoning by denying Appellant relief. However, this was in error because the only strategical decision that the state court found was concerning counsel's decision to argue against the vacation of just the sentence and/or the plea and sentence. There were no findings made, nor could there be, about whether counsel strategically chose not to argue against the State's position at the hearing because counsel did not make any argument, one way or the other, nor did he have a reason for his actions. Counsel never once tried to overcome the State's position as to Appellant's

alleged violation of his plea agreement. This lack of representation is exactly what <u>Cronic</u> prohibits.

By counsel's own words during the motion hearing at issue, the decision for Appellant to cooperate and receive a reduced sentence was because going to trial was not in his best interest and there was a high probability of a guilty verdict if Appellant went to trial. As a result, by counsel's own admission, his representation at a hearing where that agreement could have been taken away was just as important, if not more important, than the original agreement itself. Yet, counsel failed Appellant on all levels. The district court's decision to deny Appellant relief under <u>Cronic</u> was not only erroneous, but was a finding that makes the adversary process even more presumptively unreliable in this case. The only appropriate relief would be to vacate the district court's order, find that counsel was deficient and grant Appellant relief.

## CONCLUSION

Based on the arguments, facts, and case law presented above, Appellant prays that this Court will find the district court erred and vacate Appellant's judgment and sentence accordingly.

Respectfully submitted,

By: /s/ Rachael E. Reese
Rachael E. Reese, Esquire
Florida Bar No. 0111396
Rachael Reese, P.A.
807 West Azeele Street
Tampa, Florida 33606
(813) 705-8239

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B).

This brief contains 9,356 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

By: /s/ Rachael E. Reese
  Rachael E. Reese, Esquire
  Florida Bar No. 0111396

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was filed on the CM/ECF system which will then provide a copy to counsel of record on this the 18th day of March 2024.

By: /s/ Rachael E. Reese
  Rachael E. Reese, Esquire
  Florida Bar No. 0111396